## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

The Ryan N. Rice 2018 Irrevocable Trust
900 Elm Street
Manchester, NH 03101-2031

                 Plaintiff,

     v.

Rehab.com, LLC,
2330 West Joppa Road, Suite 185
Lutherville, MD 21093
**Resident Agent** is:
GREG N. REAMER
2330 WEST JOPPA ROAD, SUITE 185
LUTHERVILLE MD 21093

and

CCR Holdings, LLC,
4400 North Scottsdale Road, Unit 842
Scottsdale, AZ 85251
**Resident Agent** is:
Paracorp Incorporated
1912 Capitol Ave, Suite 500
Cheyenne, WY, 82001, USA

and

Patrick Nagle
414 Light Street, Unit 4301
Baltimore, MD 21202

             Defendants**.**

**Civil Action No**:

## <u>COMPLAINT AND DEMAND FOR JURY TRIAL</u>

Plaintiff, the Ryan N. Rice 2018 Irrevocable Trust ("the Trust"), by and through its

attorneys, files this Complaint and Demand for Jury Trial against Defendants, Patrick B. Nagle

("Nagle"), Rehab.com, LLC ("Rehab.com"), and CCR Holdings, LLC ("CCR Holdings"), alleging as follows:

## INTRODUCTION

This action arises out of a years-long and ongoing fraudulent scheme that was orchestrated by Nagle to induce the Ryan N. Rice 2018 Irrevocable Trust to invest in Rehab.com and its holding company, CCR Holdings, based on representations that the funds invested by the Trust would be used for the companies' corporate purposes, the debt held by the Trust would be converted to equity, Rehab.com would be converted to a C-corporation, and Rehab.com would engage in Series A fundraising; all of which would increase the value of the investments made by the Trust.  As a result of Nagle's representations and promises, the Trust invested $1,500,000.00 in Rehab.com and CCR Holdings between April 2019 and October 2021, making the Trust the largest outside investor in the companies.  However, since making these investments, Nagle has not delivered on the promises that induced the Trust to invest in the companies.

Nagle did not use the funds invested by the Trust to further Rehab.com's or CCR Holdings' corporate purposes.  A review of Rehab.com's books and records show that Nagle used the funds invested by the Trust—taken directly out of the Rehab.com account—to pay for his own elaborate lifestyle, spending over $1.7 million on things like personal vehicles, domain names that he registered to himself and profited from personally, a luxury penthouse, elaborate meals, extended stays at five-star hotels and resorts, gambling, and prostitutes.

As Nagle continued to use the Rehab.com account to pay for his lifestyle, Nagle's behavior became more volatile and erratic. He continuously refused to convert Rehab.com to a C-corporation, he refused to engage in Series A fundraising, and he became increasingly abusive and

belittling to his subordinates and even investors.  As a results of Nagle's actions, the performance and the financial condition of the companies began to deteriorate.

In order to keep funding his lifestyle and service the debt owed to the Trust, Nagle, Rehab.com, and CCR Holdings had to take on additional debt, often times with effective interest rates greater than 50%.  On several occasions, Nagle and the companies were not able to pay their debts as they came due, including defaulting on a loan payment to the Trust.

The Trust now brings this action to protect its investment in Rehab.com and protect Rehab.com itself, which has the potential to help millions of people if its funds are properly directed at initiatives that benefit the business rather supporting Nagle's lavish personal spending and extravagant lifestyle.

## PARTIES

1.      Plaintiff, the Ryan N. Rice 2018 Irrevocable Trust, is a trust created under the laws of New Hampshire.  The Trustee, is a resident of New Hampshire. The Beneficiary, Ryan N. Rice ("Rice"), is a resident of Texas.

2.      Nagle is an individual residing in Maryland.  Nagle is the principal, CEO, and managing member of Rehab.com.  Nagle is also the principal and managing member of CCR Holdings.

3.      Rehab.com is a limited liability company organized under the laws of the state of Maryland, with its principal place of business in Maryland at 2330 West Joppa Road Suite 185 Lutherville, MD 21093.   Rehab.com operates and administers www.rehab.com and www.mentalhealth.com, both of which are online consumer resources that connect individuals seeking mental health, physical therapy, or addiction treatment services with the appropriate

providers. Rehab.com owns the intellectual property contained on the www.rehab.com and www.mentalhealth.com domains.

4.     CCR Holdings is a limited liability company organized under the laws of the state of Wyoming, with its principal place of business at 4400 North Scottsdale Road Unit 842 Scottsdale, AZ 85251. CCR Holdings owns the domain names www.rehab.com and www.mentalhealth.com.

## JURISDICTION

5.     Jurisdiction is based upon 28 U.S.C. § 1332 as plaintiff and defendants are citizens of different states, and the amount in controversy exceeds the jurisdictional requirement of $75,000.

## VENUE

6.     Venue properly lies in this district pursuant to 28 USC § 1391(b) because Defendants do business in this judicial district, are subject to personal jurisdiction here, and a substantial part of the acts and/or omissions giving rise to Plaintiff's claims occurred in this judicial district.

## FACTS

**I.     Solicitation of Investments from the Trust**

7.     Patrick Nagle launched Rehab.com in 2016.

8.     From 2016 to 2018, Rehab.com leased the domain name www.rehab.com from an unrelated entity.

9.     In or around June 2018, CCR Holdings purchased the www.rehab.com domain name using funds loaned to the company by debt investors.

10.     On April 10, 2019, at Nagle's request, the Trust loaned $500,000 to CCR Holdings to pay off the debt that was used to purchase the rehab.com domain name in 2018.  The terms of the loan were memorialized in a promissory note and the loan was secured with the www.rehab.com domain name serving as collateral.

11.     Between April and December 2019, Nagle contacted Rice on several occasions to solicit additional investment from the Trust. Nagle represented that Rehab.com was cashflow positive but that it had significant tax liability and needed short-term liquidity to be able to pay the company's taxes and reinvest the funds so that the company could continue to grow.  Nagle represented that if the Trust were to invest an additional $1,000,000, Rehab.com would convert to a C-corporation and engage in Series A fundraising.

12.     As a result of Nagle's solicitations, on December 31, 2019, the Trust loaned CCR Holdings an additional $1,000,000, bringing its total investment to $1,500,000. The terms of the loan were memorialized in an amended promissory note ("the Amended Note"), which stated that the $1,500,000 investment would be used to pay off pre-existing debt and for general corporate purposes.  A copy of the Amended Note is attached as **Exhibit 1**.

13.     At the time of executing the Amended Note, Nagle signed a Letter Agreement ("Letter Agreement") on behalf of CCR Holdings, which memorialized that CCR Holdings intended to convert the outstanding balance of the Amended Note into an equity investment on or before February 14, 2020, which would result in a valuation of $12,500,000 in stock that the Trust owned.  A copy of the Letter Agreement is attached as **Exhibit 2**.

## II.     Improper Use of Invested Funds to Avoid Tax Liability

14.    Within days of the Amended Note being executed and the Trust making its additional investment, Nagle transferred approximately $800,000 from the Rehab.com company account into Nimble Technologies, a Guatemalan company indirectly controlled by Nagle.

15.    Nagle stated that the purpose of the transfer was to pay for "services rendered." However, at the time the funds were transferred, Rehab.com did not owe $800,000 to Nimble Technologies for services rendered.  The real purpose of the transfer was to avoid Rehab.com's impending tax liability by having Nimble Technologies transfer the $800,000 back to Rehab.com as an interest-free loan.

16.    Nimble Technologies did not end-up making the $800,000 interest-free loan to Rehab.com.  Nagle instead instructed Nimble Technologies to transfer $680,000 of the $800,000 back to Rehab.com's company account, leaving $120,000 with Nimble Technologies to pay for services that Nimble Technologies was scheduled to provide Rehab.com during 2020.

17.    Immediately after the $680,000 was transferred back to Rehab.com, Nagle transferred $40,000 from the Rehab.com company account to his personal bank account to purchase a car.

18.    The only source of capital in the Rehab.com account that was sufficient to cover the $40,000 car payment was from the funds that had been invested by the Trust on December 31, 2019.

**III.    Refusal to Convert to a C-corporation and Engage in Series A Fundraising**

19.    Shortly after Nagle orchestrated his scheme to fraudulently avoid the company's tax liability, the relationship between Nagle and the Trust began to deteriorate.

20.     Nagle began pressuring Rice to get the Trust to make additional investments in Nagle's companies, while at the same time demanding that Rice leave Nagle to his own choices about how Rehab.com should be run and managed.

21.     Throughout this period, Nagle continued to represent to Rice that Rehab.com would convert to a C-corporation and take the necessary steps to engage in Series A fundraising.

22.     In 2020, Nagle cited the COVID-19 pandemic as his primary excuse for why he was delaying converting the company and raising venture capital funds.

23.     He claimed the economy was too risky and there was too much uncertainty in the industry. Nagle also argued it didn't make sense for the company to incur the $40,000 cost of converting the company.

24.     When Rice and others refuted this claim, pointing out that venture capital investments were at an all-time high in 2020 and that the COVID-19 pandemic had created even greater demand for mental health and addiction services, he deflected, reasoning that the company needed to get organized and set up for scale before raising outside money.  However, at that time, the business had already been operating for four years and had been preparing for a conversion for several years during that time. This was a stark departure from representations Nagle made to Rice when seeking the Trust's investment, in which the company conversion was made to seem imminent.

25.     After several occasions of Nagle refusing to covert the company,  Rice offered to cover the direct expenses for the company conversion, but Nagle also refused this offer.

26.     Towards the end of 2020 and into the beginning of 2021, Nagle continued to deflect when pressed on the timing and plan for converting the Rehab.com.

27.     Nagle's excuses shifted from being about COVID-19 to being that he wanted to relocate his residence to Puerto Rico to realize the favorable tax incentives of doing so prior to converting the company.

28.     Nagle, however, continued to represent that a C-corporation conversion was forthcoming.

    a.  On January 4, 2021 Nagle sent a text message to Rice stating, "Welcome to the first official working day of 2021. This is our year for conversion, capital and growth."

    b.  On March 18, 2021, Nagle asked Rice to forego an upcoming loan payment and instead allow Rehab.com to use a portion of the funds that convert the company to a C-corporation.

    c.  On April 15, 2021, Nagle sent a text message to Rice representing that he was "in the hunt for a group to make this conversion" and would report back soon.

29.     Despite Nagle's representations that he would convert Rehab.com to a C-corporation, that never happened.

**IV.     Nagle's Absence from Rehab.com**

30.     In May 2021, Nagle relocated to Puerto Rico and subsequently began a period of mental distress that manifested in inappropriate behaviors at the company.

31.     Nagle told company employees that he was being monitored, manipulated, and controlled by a crypto-currency social network called Bitclout.

32.     Nagle also represented that he believed some combination of the CIA, the Russian mafia, and powerful tech figures such as the Winklevoss twins were manipulating him into making cryptocurrency transactions.

33.     Following these strings of erratic behavior, Nagle was checked into an in-patient psychiatric facility for several weeks.

34.     While Nagle was receiving his psychiatric treatment, Nagle provided several irrational business directives to Rehab.com employees, such as demanding Rehab.com shut down its advertising revenue.

35.     The Rehab.com team was forced to ignore these directives in order to preserve the solvency of the business.

36.     Nagle also sent unhinged emails to the CEO of Google and other prominent business contacts while in the hospital.

37.     While Nagle was away from the company, senior employees at Rehab.com assumed Nagle's management responsibilities.  The company had its highest month of revenue in over two years.

38.     During this same time, a loan repayment to the Trust became due, but the Trust provided Nagle and CCR with additional time to make the payment to allow Nagle time to recover.

39.     When he was released from in-patient psychiatric care, Nagle admitted to losing over $100,000 of Rehab.com's funds in a cryptocurrency scam.  Nagle also attributed part of his mental breakdown to his alcohol use during this period.

**V.     Nagle's Return to Rehab.com**

40.     When Nagle returned from his absence he moved back to Baltimore, Maryland. However, his erratic and volatile behavior continued.

41.     Nagle routinely engaged in abusive management practices by insulting, belittling, and intimidating company employees on a daily basis.

a. By way of example, in April 2021, one employee reported the following: "Consistently in the last month, I've experienced poor communication from Patrick—at the very worst, it has become abusive.  Instead of focusing on the work issue at hand, I was treated like the problem.  In addition to the situations listed below, I witnessed Patrick yelling at other team members, purposely interrupting team members as they try to speak, and criticizing his employees' practices and skills behind their backs."

b. This type of behavior was not new to Nagle.  In May 2019, Nagle berated two employees for over seven minutes repeatedly referring to a project that they had been working on for years as "an abortion" while repeatedly using profanity and threatening to fire the employees.

42.     Upon his return to Rehab.com, Nagle again refused Rice's requests for the company to engage in Series A fundraising despite Nagle previously representing on repeated occasions that he would do so.

## VI.     The Purported Move Toward Series A Fundraising and Execution of a SAFE

43.     Eventually in August 2021, Nagle communicated to Rice that he was bringing on a new CEO, Dan Hirschfeld, who would lead the strategy for the Series A fundraising.

44.     In October 2021, Nagle told Rice that Hirschfeld was integrating and creating a fundraising strategy and that "Jan. 1 should be eta for official kickoff."

45.     Based on the promising step Nagle had taken to bring on Hirschfeld as CEO and the renewed conversations about Series A fundraising, on October 29, 2021, the Trust restructured its debt with CCR Holdings and converted $600,000 of the outstanding debt to a Simple

Agreement for Future Equity ("the SAFE") between the Trust and Rehab.com.  The Terms of the SAFE are set forth in the SAFE Letter Agreement, attached as **Exhibit 3**.

    a.   With $600,00 of the Trust's debt going to the SAFE, the remaining $900,000 was to be repaid in installments, with the first $200,000 in principal being due on December 31, 2021, $300,000 in principal being due on June 30, 2022, $300,000 in principal being due on December 31, 2022, and the remaining $100,000 and all accrued but unpaid interest being due June 30, 2023.

    b.   The SAFE detailed the terms for calculating the equity to be issued to the Trust in the event of equity financing.

    c.   The SAFE memorialized Rehab.com's valuation cap at $12,000,000.

46.    In negotiating the debt restructuring and the SAFE Agreement, Nagle had once again represented his intention to convert Rehab.com into a C-corporation and to raise equity funding.

47.    The push to Series A fundraising was short-lived.  Almost immediately after Hirschfeld was hired,  Nagle undermined Hirschfeld's authority within the company and sabotaged his efforts to move the company to Series A fundraising.

48.    Nagle terminated Hirschfeld on December 1, 2021.

49.    Following Hirschfeld's termination, the fundraising kickoff did not happen on January 1, 2022 as Nagle had previously represented it would.

50.    After Hirschfeld left the company, Nagle printed a picture of  Hirschfeld's face and attached it to a dartboard with the phrase, "Sackless Wonder" and would throw darts at his face for amusement.  See photo attached as **Exhibit 4**.

51.     Hirschfeld's short-lived employment was nothing more than a tactic used by Nagle to make it seem as if he was actually going to take the company to the Series A fundraising stage. Nagle, however, never intended to covert the company to a C-corporation or engage in Series A fundraising despite representations that he was going to do so.

52.     Nagle could not allow the company to advance to the Series A fundraising stage. If Rehab.com had gone to Series A fundraising, the company's financials would have been scrutinized by potential investors, and Nagle's fraudulent use of company funds to pay for his lifestyle would have been discovered.

## VII.   Taking on Additional Debt to Make Loan Payments to the Trust

53.     Under the terms of the SAFE Letter Agreement, CCR Holdings was required to repay the Trust $200,000 of the $1,500,0000 principal by December 31, 2021.

54.     Leading up to the December 31, 2021 payment, Nagle attempted to delay repaying the $200,000 to the Trust and requested to amend the terms of the loan payment schedule.

55.     When Rice and the Trust refused to do so, Nagle was forced to take out loans to pay the funds owed to the Trust, despite Nagle's representations that the company had positive cashflows of $30,000 to $50,000 per month.

56.     For one source of funds, Nagle convinced a Rehab.com employee to loan him $65,000 by putting into writing the employee's years-long oral agreement regarding equity the employee would receive in the company after conversion.

57.     Nagle asked the employee to make the payment directly to Nagle's personal account to avoid paperwork.

58.     Nagle then transferred the loaned funds into the Rehab.com account and added it to the books as a personal loan, appearing as if Nagle had loaned the company an additional $65,000.

59.     Nagle then fraudulently began collecting interest on the $65,000 in loaned funds.

60.     The second loan repayment to the Trust became due on June 30, 2022 per the terms of the SAFE Letter Agreement.

61.     Prior to the $300,000 loan repayment coming due on June 30, 2022, Nagle once again tried to renegotiate the loan payment schedule to give him more time to pay the loan.

62.     Nagle represented that he needed the funds to acquire a new domain name— www.mentalhealth.com.

63.     The Trust refused to renegotiate the payment schedule, and in retaliation, Nagle subsequently removed Rice's access to all company communication platforms.

64.     When CCR Holdings failed to make the payment by the June 30, 2022 deadline, it defaulted on its loan obligations.

65.     The Trust subsequently provided Nagle and CCR Holdings with a notice of default, which triggered a 30-day cure period for the $300,000 payment to be made.

66.     In addition to CCR Holdings being unable to make the $300,000 loan payment to the Trust, Rehab.com was unable to pay its operating expenses, specifically payroll, in the ordinary course of business.

67.     In order to obtain funds to service June 30, 2022 loan payment, Nagle used the same strategy to solicit funds from several new debt investors that he used to solicit funds from the Trust in 2019.

68.     Ultimately, Nagle was able to secure an additional $1,000,000 in debt, portions of which (and possibly all of which) have an effective interest rate greater than 50%.

69.     Nagle used this additional financing to make the $300,000 payment to the Trust, and cover short-term operating expenses.

70.     Nagle was eventually able to pay the outstanding wages owed to the Rehab.com employees, but their paychecks were four days late.

71.     Nagle also used a large portion of the $1,000,000 in additional loaned funds to purchase the domain name www.mentalhealth.com.

72.     Nagle unilaterally made the decision to purchase the mentalhealth.com domain name despite the high amount of debt Rehab.com was operating under without any strong revenue streams.

## VIII.   Examination of Company Books Reveals Misappropriation of Company Funds

73.     Following the events that took place in June and July 2022, Rice and Rehab.com senior employees took a closer look at Rehab.com's finances and how the company was being managed.

74.     After conducting an accounting of Rehab.com's expenses, Rice and other senior Rehab.com employees learned that Nagle had spent over $1.7 million of Rehab.com's funds on personal expenditures, and that these expenditures were not accounted for against loans that Nagle had previously made to the company.  Many of Nagle's personal expenses were paid from the funds that the Trust had invested, as there were no other sources of capital for the company to use when several of the transactions took place.

75.     Some of Nagle's most egregious uses of company funds for personal expenses are as follows:

a. Nagle used over $60,000 in company funds to pay for a months-long stay at a Four Seasons resort for purely personal reasons.

b. In October 2021, Nagle used company funds to place several thousand dollars of bets on sporting events.  Nagle ultimately lost $6,000 on these bets, all of which were charged to the company account as a business expense.

c. In September 2022, over the course of two weekends, Nagle visited Jaco, Costa Rica and charged $500 in hotel expenses to the company and withdrew over $800 in cash from the company's account that was, upon information and belief, used to pay for prostitutes.

76.    During the course of their accounting, Rice and senior employees at Rehab.com also discovered that Nagle had spent over $523,000 in company funds to purchase domain names that Nagle registered to himself.   Nagle then sold several of the domain names and kept the profits for himself.

77.    The chart below summarizes how Nagle has used Rehab.com's funds to support his lavish personal spending and extravagant lifestyle from January 2020 through August 2022.

| | |
|---|---|
| Personal Apartment Lease | $173,601.08 |
| Personal Apartment Maintenance | $624.42 |
| Personal Car Expenses | $1,751.52 |
| Personal Car Insurance | $1,789.53 |
| Cash Withdrawal | $7,750.21 |
| Investment in Cryptocurrency | $199,272.58 |
| Personal Food Expenses | $67,872.01 |
| Personal Hotel and Vacation Expenses | $230,003.89 |
| Personal Insurance | $22,106.33 |

| | |
|---|---|
| Shopping for Personal Items | $41,818.73 |
| Personal Streaming Services | $901.95 |
| Miscellaneous Personal Expenses | $19,593.73 |
| Personal Venmo Transfers | $14,544.00 |
| Wires to Personal Account | $395,040.66 |
| Personal Phone, TV, and Internet | $9,817.09 |
| Personal Domain Asset Purchases | $523,580.36 |
| **Total** | **$1,710,068.09** |

78.     This course of spending demonstrates that Nagle never intended to create a profitable business with equity opportunities for the Trust.  Rather, Nagle intended to create a business in which he could string the Trust and other investors along with intermittent promises so that he could continue to extract investments and use those funds to pay for his personal expenses and lifestyle, while retaining sole control over all company assets, and hiding his misdeeds by refusing to convert the company into a C-corporation and engage in Series A fundraising.

### **FIRST CAUSE OF ACTION**
**(Fraud and Fraud in the Inducement Against Nagle and CCR Holdings)**

79.     The Trust incorporates all preceding paragraphs as if fully set forth at length herein.

80.     Prior to executing the Amended Note, Nagle and CCR Holdings expressly represented to the Trust that CCR Holdings would use the Trust's investments to pay off preexisting debt and for general company purchases.

81.     Nagle and CCR Holdings intentionally misrepresented their intentions for the investments solicited from Rice and the Trust and made these misrepresentations with knowledge of their falsity.

82.     Nagle and CCR Holdings knew at the time of soliciting funds from Rice and the Trust that the true purpose for the funds was not exclusively to pay off preexisting debt and/or for general corporate purposes, but rather to fund Nagle's personal lifestyle.

83.     Nagle also intentionally misrepresented to Rice and the Trust that he intended to convert Rehab.com into a C-corporation and to engage in Series A funding.

84.     Nagle knew at the time of soliciting funds from Rice and the Trust that he did not intend to convert Rehab.com into a C-corporation, nor did he intend to engage in  Series A fundraising.

85.     In addition to the above, Nagle also concealed the fact that he intended to and did in fact use funds invested by the Trust to pay for his personal, non-business-related expenses and fund his lifestyle.

86.     As a result of Defendants' fraudulent conduct, the Trust invested $1,500,000 into CCR Holdings for purposes of benefitting Rehab.com, but those investments have been squandered and used to fund Nagle's lifestyle.   Moreover, over $1,000,000 remains owed to the Trust under the terms of the Amended Note and SAFE Letter Agreement, which is unlikely to be paid back to the Trust as a result of Rehab.com's insolvency and CCR Holding's rising debt at increasingly high interest rates.

**<u>SECOND CAUSE OF ACTION</u>**
**(Fraudulent Conveyance Against Nagle, CCR Holdings, and Rehab.com)**

87.      The Trust incorporates all preceding paragraphs as if fully set forth at length herein.

88.     Defendants engaged in fraudulent transfers by using Rehab.com company funds—which existed as a result of investments made by the Trust to CCR Holdings—to make transfers to Nagle for purely personal, non-business-related expenses.

89.     Defendants made transfers to Nagle with the intent that they defraud the Trust by transferring funds invested by the Trust in CCR Holdings for corporate purposes to Nagle so that Nagle could use those funds to pay for his lifestyle.

90.     Defendants' intent to defraud the Trust is demonstrated by the following facts:

a.   The funds were transferred to Nagle who, as the principal of CCR Holdings and Rehab.com, was acting as an insider when he received these transfers.

b.   Nagle concealed the nature of the transfers when questioned about his expenses and by retaining control of the funds after he made the transfers to himself.

c.   Rehab.com has become insolvent as a result of the transfers and the excessive personal expenditures by Nagle.

d.   The transfers were made for no real consideration.

91.     As a result of Defendants' fraudulent conveyances Rehab.com is insolvent and the Trust's investments have been squandered.

### THIRD CAUSE OF ACTION
**(Negligent Misrepresentation Against Nagle and CCR Holdings)**

92.     The Trust incorporates all preceding paragraphs as if fully set forth at length herein.

93.     Nagle and CCR Holdings negligently misrepresented to Rice and the Trust that it would use funds invested by the Trust for the purpose of paying off preexisting debts or for general corporate purposes when they in fact used the funds for the undisclosed purpose of funding Nagle's personal lifestyle.

94.     Nagle and CCR Holdings also negligently misrepresented to Rice and the Trust that it planned to convert Rehab.com into a C-corporation and to engage in Series A fundraising.

95.     Nagle and CCR Holdings owed a duty to the Trust to investigate these statements and reasonably determine that they were true and accurate before making them.

18

96.     Nagle and CCR Holdings had no reasonable grounds to believe that these misrepresentations were true given that Nagle was knowingly using Rehab.com funds for purposes other than those represented to Rice and the Trust and that it did not have any imminent plans or intentions to convert Rehab.com into a C-corporation or engage in Series A funding.

97.     Nagle and CCR Holdings induced Rice and the Trust to rely on its misrepresentations and knew that the Trust would not have executed loans to CCR Holdings or structured a SAFE with CCR Holdings if it had not made the misrepresentations to Rice and the Trust.

98.     Rice and the Trust were justified in its reliance upon Defendants' misrepresentations, as it had no reason to know that Nagle's personal expenditures were being funded by Rehab.com or that Nagle never intended to convert Rehab.com to a C-corporation and engage in Series A funding.

### FOURTH CAUSE OF ACTION
**(Breach of Contract Against CCR Holdings)**

99.     The Trust incorporates all preceding paragraphs as if fully set forth at length herein.

100.    The Note and Amended Note are valid and enforceable contracts between CCR Holdings and the Trust.

101.    The Note and Amended Note included provisions that the investments made by the Trust to CCR Holdings would be used for the purpose of paying off preexisting debts or for general corporate purposes of the company.

102.    The Trust performed its duties under the Note and Amended Note by transferring the promised loan payments to CCR Holdings.

103.    CCR Holdings failed to perform under the Note and Amended Note when Nagle fraudulently conveyed funds to himself and used Rehab.com funds, for his personal expenditures.

Funding Nagle's lifestyle is neither a repayment of existing debt held by CCR Holdings nor a general corporate purpose.

104.     As a result of these breaches, the Trusts investments were used for purposes other than what they were directed to be used for and the repayment of the investment has been put at risk due to Rehab.com's insolvency.

**FIFTH CAUSE OF ACTION**
**(Breach of Implied Covenant of Good Faith and Fair Dealing against CCR Holdings and Rehab.com)**

105.     The Trust incorporates all preceding paragraphs as if fully set forth at length herein.

106.     All contracts imply a covenant of good faith and fair dealing in the course of performance, including the Note, Amended Note, and SAFE executed between CCR Holdings and/or Rehab.com and the Trust.

107.     CCR Holdings breached the implied covenant of good faith and fair dealing and deprived the Trust of its benefits under the Amended Note when it allowed Nagle to use the investments for reasons that were completely unrelated to repaying the company's debts or general corporate purposes.

108.     Defendants' actions harmed the Trust's investment by making it less likely that the invested funds and related interest will be repaid, and by using the investments for purposes that they were not intended to be used for.

109.     Rehab.com also breached the implied covenant of good faith and fair dealing and deprived the Trust of its benefits under the SAFE and SAFE Letter Agreement when it structured this debt arrangement upon the premise that equity funding was a possibility that would convert the Trust's loan into equity with a value cap at $12,500,000.

110.    Rehab.com never intended for the conversion events to occur, which has been demonstrated by Defendants' course of conduct in repeatedly using company funds to pay Nagle's personal expenses all while refusing to issue any equity in Rehab.com

111.    By never intending to issue equity, Rehab.com effectively misappropriated $600,000 of the Trust's investment, tying it up in an insolvent company, with no avenue to recoup the $600,000 through the SAFE.  As such, Rehab.com's breach of the implied covenant of good faith and fair dealing has harmed the Trust in the amount of $600,000.

### SIXTH CAUSE OF ACTION
### (Breach of Fiduciary Duty Against Nagle)

112.    The Trust incorporates all preceding paragraphs as if fully set forth at length herein.

113.    Rehab.com is an insolvent company as its liabilities exceed its assets and it has been unable to pay its expenses as they have become due in the normal course of business, including its inability to make payroll and pay the Trust's debt installments in a timely manner.

114.    Upon achieving insolvency, Rehab.com owed fiduciary duties of care and loyalty to its creditors, including the Trust.

115.    After Rehab.com became insolvent, Nagle breached the fiduciary duties of care and loyalty he owed to the Trust, as a creditor of Rehab.com, by misappropriating company funds solely for his personal benefit.

### SEVENTH CAUSE OF ACTION
### (Alter Ego Liability Against Patrick Nagle for the Debts of CCR Holdings and Rehab.com)

116.    The Trust incorporates all preceding paragraphs as if fully set forth at length herein.

117.    Nagle is the CEO, principal and managing member of Rehab.com.  He exercises sole dominion and control over the operations of Rehab.com.

118.    Nagle is the principal and managing member of CCR Holdings.  He exercises sole dominion control over the operations of CCR Holdings.

119.    Nagle has used CCR Holding's and Rehab.com's company bank accounts as his own personal piggybank and has comingled the assets of the companies with his personal assets.

120.    As an example, Nagle has used CCR Holding's and Rehab.com's bank accounts to purchase hundreds of domain names unrelated to the business operations of CCR Holdings or Rehab.com in his own name.  Nagle has not repaid Rehab.com for these purchases, nor has he kept detailed or accurate records of these expenditures.

121.    Neither CCR Holdings nor Rehab.com are adequately capitalized for the purpose of corporate undertakings. The companies are insolvent and are only operating by means of taking on additional debt at higher interest rates than prior loans to cover payments coming due on prior loans. Patrick Nagle continues to use newly acquired investments to make risky personal investments and personal expenditures instead of earmarking additional capital for investor repayment.

122.    Under Nagle's leadership and at his direction, CCR Holdings and Rehab.com have failed to follow corporate formalities as are required by law.

123.    Patrick Nagle created CCR Holdings and Rehab.com as mere shields for the penetration of his fraudulent scheme to solicit investor funds to fund his personal lifestyle.

124.    CCR Holdings and Rehab.com also exist as façades for Nagle's self-dealing and as instrumentalities to conduct risky investments outside of the business purposes of CCR Holdings or Rehab.com.

125.    Nagle has operated CCR Holdings and Rehab.com as his alter egos and as such Nagle is personally liable for the debts of CCR Holdings and Rehab.com.

## <u>EIGHTH CAUSE OF ACTION</u>
### (Injunctive Relief Against Patrick Nagle, CCR Holdings, and Rehab.com)

126.    The Trust incorporates all preceding paragraphs as if fully set forth at length herein.

127.    The Trust seeks both preliminary and permanent injunctions prohibiting Defendants from using the corporate assets of Rehab.com or CCR Holdings for any purpose other than paying corporate expenses as they become due in the ordinary course of business and as part of this relief requested, specifically request that Defendants be enjoined from using any Rehab.com or CCR Holdings corporate funds to pay any of Nagle's personal expenses.

128.    Based on the facts pleaded herein, the Trust is likely to succeed on the merits of its claims.

129.    The Trust is also likely to suffer irreparable harm absent the requested injunctive relief being granted.

    a.    Both CCR Holdings and Rehab.com are already insolvent and cannot pay their debts as the become due in in the ordinary course of business.

    b.    The Trust and other investors will suffer irreparable harm if the requested injunction is not granted and Defendants are allowed to continue siphoning off the remaining corporate assets to fund Nagle's lifestyle as there will be no assets left to repay the Trust's and other investors loans.

130.    Granting the requested relief maintains the status quo and simply prevents conduct that previously should not have been allowed to occur.

131.    Granting the injunctive relief requested is in the best interest of the public because it will preserve the Trust's and others' investments in Rehab.com and CCR Holdings and allow the companies to continue to operate in the ordinary course of business and continue to provide valuable and beneficial services to the public at large.

## PRAYER FOR RELIEF

**WHEREFORE**, the Trust respectfully requests that judgment be entered in its favor against Defendants and the following relief be granted:

1) The Trust's agreements with Defendants be voided and the entire amount of the Trusts' investments in CCR Holdings and Rehab.com be returned with interest;

2) An award of monetary damages and other just compensation in amounts to be determined at trial, such amounts being sufficient to make Plaintiff whole;

3) That the fraudulent conveyances made to Nagle be avoided; that Defendants be enjoined from making any further disposition of assets or investments from CCR Holdings or Rehab.com outside of paying corporate expenses as they become due in the ordinary course of business; the Defendants specifically be enjoined from using any Rehab.com or CCR Holdings corporate funds to pay any of Nagle's personal expenses; that a receiver be appointed to take charge of the assets fraudulently transferred to Nagle and be returned to the Trust; and/or any other relief available under the New Hampshire Fraudulent Conveyance Statute;

4) That the Trust be awarded punitive damages and any attendant costs associated with this litigation, including reasonable attorneys' fees; and

5) That the Trust be awarded any further relief that this Court deems just and equitable.

November 19, 2022                          Respectfully submitted,

                                           */s/Michael E. Blumenfeld*
                                           Michael E. Blumenfeld (Bar No. 25062)
                                           Wesley T. Moran *(Pro Hac Vice to be filed)*
                                           Rob Lindholm *(Pro Hac Vice to be filed)*
                                           Shannon Coy *(Pro Hac Vice to be filed)*
                                           Nelson Mullins Riley & Scarborough LLP
                                           100 S. Charles Street | Suite 1600
                                           Baltimore, Maryland 21201
                                           (443) 392-9402 (Telephone)
                                           (443) 392-9499 (Facsimile)
                                           michael.blumenfeld@nelsonmullins.com
                                           wes.moran@nelsonmullins.com
                                           robert.lindholm@nelsonmullins.com
                                           shannon.coy@nelsonmullins.com

                                           *Counsel for Plaintiff*


## DEMAND FOR JURY TRIAL


Plaintiff elects to have this case tried before a jury.


November 19, 2022                          Respectfully submitted,

                                           */s/Michael E. Blumenfeld*
                                           Michael E. Blumenfeld (Bar No. 25062)
                                           Wesley T. Moran *(Pro Hac Vice to be filed)*
                                           Rob Lindholm *(Pro Hac Vice to be filed)*
                                           Shannon Coy *(Pro Hac Vice to be filed)*
                                           Nelson Mullins Riley & Scarborough LLP
                                           100 S. Charles Street | Suite 1600
                                           Baltimore, Maryland 21201
                                           (443) 392-9402 (Telephone)
                                           (443) 392-9499 (Facsimile)
                                           michael.blumenfeld@nelsonmullins.com
                                           wes.moran@nelsonmullins.com
                                           robert.lindholm@nelsonmullins.com
                                           shannon.coy@nelsonmullins.com

                                           *Counsel for Plaintiff*